DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} On March 3, 2003, relator, ABF Freight Systems, Inc., filed a complaint asking this court to issue a writ of mandamus directing respondent Industrial Commission of Ohio ("commission"), to vacate a May 2002 order granting respondent Delmer G. Sipple's application for permanent total disability ("PTD") compensation, and to issue a new order denying respondent Sipple's application for PTD benefits.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, relator's complaint was referred to a magistrate of this court on March 12, 2003. After reviewing the record, the briefs, and the arguments of counsel, the magistrate issued a decision and recommendation on August 28, 2003. (Attached as Appendix A.) In that decision, the magistrate addressed relator's arguments in detail, as well as the reasons supporting the magistrate's recommendation as to why relator's request for a writ of mandamus should be denied. The matter is now before this court upon relator's objections to the August 28, 2003 decision and recommendation of the magistrate.
 {¶ 3} Before addressing relator's objections in detail, we wish to explain once again that in order for a writ of mandamus to issue, a relator must demonstrate: (1) that he or she has a clear legal right to the relief sought; (2) that the commission has a clear legal duty to provide such relief; and (3) that he or she has no other adequate remedy at law. State ex rel. Berger v.McMonagle (1983), 6 Ohio St.3d 28, 29. A request for a writ of mandamus will not be granted when there is "some evidence" supporting the decision of the commission. State ex rel. Mees v.Indus. Comm. (1972), 29 Ohio St.2d 128. Indeed, "[q]uestions of credibility and the weight to be given evidence are clearly within the commission's discretionary powers of fact finding."State ex rel. Teece v. Indus. Comm. (1981), 68 Ohio St.2d 165,169. However, where there is no evidence upon which the commission could have based its conclusion, an abuse of discretion is present, and a writ of mandamus may become appropriate. State ex rel. Hutton v. Indus. Comm. (1972),29 Ohio St.2d 9.
 {¶ 4} In 1998, respondent Sipple sustained several work-related injuries while employed as a tractor-trailer driver by relator. Respondent Sipple's subsequent workers' compensation claim was allowed for cervical strain, a bruised head and left shoulder, and cervical disc herniation at the C5-6 and C6-7 levels. In April 1999, respondent Sipple underwent surgery, wherein a two-level cervical disc fusion was performed. Respondent Sipple also tried regular epidural injections in order to relieve his pain.
 {¶ 5} Respondent Sipple returned to work for a brief period in August 1999, took additional leave, and returned to work in January 2000. When he returned, respondent Sipple participated in relator's "Alternative Work Program," ("AWP"), which he described as consisting of nothing more than picking up bills on the trailer dock and walking them to the office of the billing clerk.
 {¶ 6} Approximately two months after respondent Sipple returned to work, relator concluded that respondent Sipple was no longer eligible to participate in the AWP due to his physical restrictions. Relator therefore terminated respondent Sipple's employment. Respondent Sipple filed for PTD benefits in May 2001. Respondent Sipple's application for PTD benefits was granted, leading to relator's appeal of that decision at the administrative level, and now at the appellate level before this court in the form of relator's request for a writ of mandamus.
 {¶ 7} As a result of independent review of the record, relator's complaint, the briefs filed in response to that complaint, the magistrate's decision, and the briefs filed in conjunction with relator's objections to the magistrate's decision, we conclude that the magistrate correctly determined the pertinent facts and applied the relevant law to those facts.
 {¶ 8} In relator's objections to the magistrate's decision, relator raises issues and arguments which are predominately, if not actually, the same issues raised, considered, and rejected by the magistrate in her decision and recommendation. For instance, in relator's first argument, relator maintains that the "commission abused its discretion by relying on [Mr. William T. Cody's] vocational report" which, in relator's opinion, is "premised on inaccurate and incomplete information." (Relator's objections, at 4.) However, after discussing this matter at length, the magistrate explained:
* * * The [relator] argued in detail as to why the commission should discount the Cody report as unpersuasive. Thus, the hearing officer was well aware of the details of claimant's work history and how it could be interpreted as supporting a capacity to return to work. The commission simply found Mr. Cody's report more convincing than the report of Ms. Carr or Mr. Macy. The magistrate concludes that Mr. Cody's statement about claimant's lack of transferable skills for sedentary work was not a fatal defect that must disqualify his report from evidentiary consideration.
August 23, 2003 Magistrates Decision (¶ 44 of Appendix A):
 {¶ 9} The magistrate went on to explain:
* * * The magistrate acknowledges that Mr. Cody appeared to minimize or skim over experiences suggesting that claimant could return to some type of work and, in contrast, emphasized the factors suggesting that claimant could not perform sustained remunerative employment. However, the magistrate concludes that the imperfections in Mr. Cody's report went to its weight and credibility rather than disqualifying the report from evidentiary consideration as a matter of law.
Id. (¶ 48 of Appendix A).
 {¶ 10} After completing the independent review necessitated by Civ.R. 53(E)(3)(b), we are unable to conclude that relator has demonstrated any material error in the magistrate's reasoning, logic, or decision.
 {¶ 11} Accordingly, as a result of our independent review, we agree with the magistrate's analysis of the issues and arguments in this case. We further find no merit in relator's objections to the magistrate's decision. As stated herein, we find that relator's objections reargue issues which have been sufficiently addressed in the magistrate's decision.
 {¶ 12} Accordingly, having independently reviewed the record of this proceeding, including the magistrate's decision and relator's objections to that decision, we hereby adopt the magistrate's August 28, 2003, decision as our own, including the findings of fact and conclusions of law contained therein. As such, relator's objections to the magistrate's decision are overruled, and in accordance with the magistrate's decision, relator's request for a writ of mandamus is denied.
Objections overruled, writ denied.
Bowman and Bryant, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. ABF Freight System, Inc., : Relator, : v. : : No. 03AP-195 Industrial Commission of Ohio : (REGULAR CALENDAR) and Delmer G. Sipple, : Respondents. :
 MAGISTRATE'S DECISION Rendered on August 28, 2003.
IN MANDAMUS
 {¶ 13} In this original action in mandamus, relator, ABF Freight Systems, Inc., asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order awarding compensation for permanent total disability ("PTD") to respondent Delmer G. Sipple and to issue a new order denying PTD compensation.
Findings of Fact
 {¶ 14} 1. On June 5, 1998, Delmer G. Sipple ("claimant") sustained a work-related injury while employed as an over-the-road truck driver, and his workers' compensation was allowed for cervical strain, bruised head and left shoulder, and herniated cervical discs at C5-6 and C6-7.
 {¶ 15} 2. In April 1999, claimant underwent surgery, a two-level cervical fusion. Claimant next tried repeated epidural blocks, obtaining temporary reduction of pain. In medical reports, claimant reported constant neck pain and headaches, radiating pain into the right upper extremity and numbness at times.
 {¶ 16} 3. The employer had an Alternative Work Program ("AWP"), which it described as "a light duty work program established for employees who have on the job injuries." However, workers were no longer eligible for this program after they were found to have permanent work restrictions that prevented them from returning to their jobs.
 {¶ 17} 4. Claimant participated in the AWP for two periods of time: August 3, 1999 to August 16, 1999, and January 18, 2000 to May 8, 2000.
 {¶ 18} 5. As of May 8, 2000, the employer found claimant no longer eligible for AWP because his physical restrictions were found to be permanent. Claimant's employment was terminated, and he applied for pension benefits through his union.
 {¶ 19} 6. In May 2001, claimant filed a PTD application, stating that he was born in April 1937, completed the 11th grade, and could read, write, and perform basic math. He also completed the vocational questionnaire that supplements the PTD application, on which he indicated that, from June 1974 to July 1998, he was an over-the-road truck driver.
 {¶ 20} In addition, from 1947 to 1951, he put up hay and hoed tobacco on his grandfather's farm. In 1952, he worked in a service station. From 1953 to 1955, he worked on the family dairy farm, and he also worked during that time in a movie theater (1953) and in a service station (1954 and 1955). From 1955 to 1958, he worked installing aluminum products and served for a time as a manager. From 1958 to 1965, claimant was self-employed as a contractor and also did assembly work for a manufacturer in 1963. From 1965 to 1974, he worked for Sears Roebuck as a home-remodeling salesman.
 {¶ 21} Claimant provided a description of his duties in these jobs. For example, as a truck driver he operated a tractor-trailer over long distances and also learned regulations governing safety, hazardous materials, vehicle inspection, and so forth. He read the manifest, bills of lading, and road maps, and he was required to keep a daily log book and fill out forms. At one point, he took a course in trucking matters. As an installer, he would measure and cut aluminum siding and install doors and windows using electric saws, drills, screwguns, etc. As a salesman, he was taught about the company's products, and he would estimate the costs of remodeling jobs and fill out contracts.
 {¶ 22} 7. Claimant submitted a medical opinion from James Molnar, M.D.
 {¶ 23} 8. Claimant was examined on behalf of the employer by Ron M. Koppenhoefer, M.D., who found that claimant could not return to work as a truck driver. Dr. Koppenhoefer concluded that, with the stress on the cervical spine, claimant would be limited to sedentary work activity. He saw no evidence to indicate that claimant was unable to perform sedentary work activities as long as he was able to move his neck freely and avoid repetitive motion and chronic positioning of the cervical spine. Dr. Koppenhoefer also noted that claimant was taking five tablets of Vicoprofen per day and five tablets of Neurontin per day.
 {¶ 24} 9. In September 2001, a vocational assessment was submitted on claimant's behalf by William T. Cody. In regard to the materials he reviewed, Mr. Cody stated:
* * * The following documents were examined, the 4/27/01 letter of James Molnar, MD, the 8/16/01 letter of Ronald Koppenhoefer, MD, and Mr. Sipple's application for permanent and total disability benefits, which includes a description of his educational and vocational histories.
With respect to claimant's work history, Mr. Cody stated:
In 2000 Mr. Sipple worked in a light duty capacity in the trucking field for a period of nine months.
From 1974 until 1998, Mr. Sipple worked as a truck driver. In this position he was responsible for driving a tractor and trailer to a specific location. He handled up to fifty pounds on an occasional basis. This semiskilled job was performed at the medium level of physical demand The driving skills that he acquired through the performance of this position transfer to light level driving jobs.
From 1947 until 1974, Mr. Sipple worked in various unskilled and semiskilled jobs that were largely performed at the medium level of physical demand, such as assembler, farm worker, service station worker, and aluminum installation worker. The skills that he acquired through these positions, for the most part, do not transfer into the labor market of today because the process in performing the required tasks has changed over the past twenty-seven years. The tool usage skills that do transfer to tasks as they are performed today exist only in jobs performed at the medium, or higher, levels of physical demand
 {¶ 25} After reviewing the medical reports, Mr. Cody provided an analysis of vocational potential:
Mr. Sipple has work experience in a job performed at the medium level of physical demand and he has acquire[d] skills that transfer to light level driving jobs. He has no experience in or skills that transfer to positions performed at the sedentary level of physical demand Therefore, only unskilled sedentary jobs can be considered as appropriate for Mr. Sipple, according to the limitations provided by Dr. Koppenhoefer. Mr. Sipple's limited, eleventh grade, ed-ucation and his manual trade work history do not support his performance of semiskilled work within his physical capacity, especially clerically based work.
Mr. Sipple would be unable to adapt to a new kind of work activity. He is sixty-four years of age and has significant physical limitations, a substantial degree of pain, a manual trade work history, and a limited, eleventh grade, education. Under these circumstances, he could not be expected to adequately adapt to the new tools, tasks, procedures, and rules involved in performing a new type of work activity, a type of work that he has not performed in the past. This holds true even for unskilled work. The Industrial Commission defines the age of sixty-four years as closely approaching advanced age. Being of this age presents its own obstacles in terms of adjusting to a new kind of work activity. When combined with significant physical impair-ments, a manual trade work history, substantial pain, and a limited education, being of this age clearly serves as a contributing factor to an inability to make vocational adjustments. The situation was the same in 2000, at the time he last worked.
Therefore, in the opinion of this vocational expert, Delm[e]r Sipple is permanently and totally occupationally disabled. That is, there are no jobs in the local or national economies that he is able to perform. This conclusion was reached considering his closely approaching advanced age, limited education, manual trade work history, and the physical limitations that he has as a result of his allowed injury, claim number 98-453564.
 {¶ 26} 10. The record also includes a September 2001 medical report from James T. Lutz, M.D., and vocational reports from Penny Carr and Ted Macy submitted in October 2001.
 {¶ 27} 11. In addition, the employer filed a videotape showing claimant's activities at his home on October 13, 2001. The tape shows claimant over the course of about an hour, working intermittently on a door. The most strenuous activity was carrying the door onto a porch, which took a few seconds. After that, however, a woman came out of the house to help him. She carried the door to the yard and placed it on saw horses for him. When the door had to be turned over, she lifted it and flipped it over for him. Further, the tape shows claimant taking three breaks to sit down and rest. Also, at frequent intervals, claimant is not visible on the tape, either because he walked into an area hidden from view or because the cameraperson periodically taped trees and rooftops instead of claimant. The employer filed the tape with the commission in January 2002.
 {¶ 28} 12. In January 2002, the employer filed an affidavit stating that AWP workers like claimant were assigned tasks such as answering the telephone, yard checks (checking to make sure that all trailers at the terminal were accounted for), and entering dispatch information into the computer. The affidavit stated that claimant was able to perform these tasks during the two periods of time he participated in the program.
 {¶ 29} 13. In March 2002, a PTD hearing was held before a staff hearing officer ("SHO"). A transcript was made of the hearing. Claimant objected to the employer's videotape and affidavit because they were not filed until January 2002, outside the period for submitting evidence. In addition, the SHO expressed concern about testimony from Mr. Cody, who had appeared to testify, explaining that a party could not present live testimony from a vocational expert in a manner that would circumvent the deadline for submitting vocational evidence.
 {¶ 30} 14. Claimant testified at the hearing, stating among other things that he was now using a Duragesic patch for pain and that it helped reduce the pain but made him feel "dopey." Claimant stated that he did not sleep well, not more than three hours at one time, and that he took naps several times per day, usually after taking medication that made him drowsy. He stated that he rarely drove because he could not turn his head.
 {¶ 31} On cross-examination, claimant stated that he could read a newspaper, write a check, and make change for a $20 bill. He reiterated the information on his vocational questionnaire, admitting that, when working as a truck driver, he would read the manifests and check them against the cargo contents and weights, and also check for "hazmat" cargo. He agreed that he had a working knowledge of trucking regulations and was able to complete driver logs that tracked his movements over a day, as he had already stated on the application's questionnaire.
 {¶ 32} As for the alternative work provided by the employer, claimant said he did not actually have a job. He would just walk the dock and pick up bills behind each trailer and take them to the billing clerk. He very seldom answered a telephone. Claimant said that it bothered him that he was being paid to "do nothing" because he had worked hard all his life, but the supervisors advised him that it was just a transition to get him back to his regular job. Claimant stated that he tried to use a computer during this program but "wasn't very successful at it." Claimant stated that, even with having a job created for him, he could not put in a full week's work and that eight or nine times in three to four months, his wife had to come and get him.
 {¶ 33} Claimant said he did not use the computer in his home at all, not even for internet access. He explained that, although his children used it, he was not very computer literate. When asked if he thought he could "do it if someone helped you," he answered, "If I went through a training program, I'm sure I could, I could pick it up." In regard to his work at Sears, claimant stated that he would go to a site and estimate a job and write a contract for the work, and that when he was self-employed as an installer, he kept track of paperwork. He explained that, when he served as a manager, he supervised six installers, and that he had to read and follow installation instructions at times. Claimant agreed that he had to deal with customers and that he could read a contract. Claimant said that, if everything were the same as it was 25 to 30 years ago, he could go to a site and estimate a job. However, he explained that he could not work as a quality inspector or crew supervisor because the pain medications affected his ability to stay alert, and his lack of sleep and his napping also made it difficult to perform a job.
 {¶ 34} Claimant testified that he had been a workaholic and had usually worked 70 hours a week on the truck and then worked 20 to 25 hours on the farm, but now he could not work. He said that sitting around was driving him crazy and that Dr. Molnar said he had to accept the fact of his disability. Claimant stated: "If I could go to work tomorrow, I'd give anything in the world if I could go to work tomorrow."
 {¶ 35} 15. In the closing argument, the employer's counsel highlighted reasons that the commission should reject Mr. Cody's report:
You do have Mr. Sipple's vocational questionnaire in the file. That is a supplement to the permanent and total disability application itself. You also have his testimony and I think those two items, when taken together, provides you with a nice background of Mr. Sipple's work history and the skills that he used over the course of that work history, in fact, the skills that he possesses today.
Those skills reflect he's capable of understanding rules and regulations. Those skills reflect that he has the ability to process the information given to him and apply it. He does indicate that he has supervised folks in the past and that he's interacted with the public in the past.
Now, we have this report from Mr. Cody. Mr. Cody concluded that this gentleman does not possess the transferable skills to perform reduced capacity employment. A few comments with respect to the report of Mr. Cody. I point your attention to paragraph number one.
Mr. Cody indicates that he reviewed Mr. Sipple's application for permanent total disability benefits. It does not indicate there that he reviewed the separate vocational questionnaire which sets forth a rather more detailed accounting of this gentleman's work history.
Secondly, with respect to paragraph three, it indicates that this gentleman did not have vocational training but as to the vocational questionnaire and Mr. Sipple's testimony pointed out today not only did he have vocational training and installation training but also on-the-job training which I think is significant.
Paragraph four mentions that he worked light duty for ABF but it doesn't mention what that light duty work actually involved, and then ultimately in paragraph five it mentions that Mr. Sipple's driving skills would not transfer to reduced capacity employments but what he does not comment on it the fact that there are skills he used as an over-the-road truck driver for ABF. Mr. Cody's report doesn't say truck driver, just driver.
I think Mr. Sipple's testimony [shows] he's more than that. He's capable of processing information and reading rules and regulations. He's capable of reading maps and logs. He's capable of performing as a salesman, as an installer, capable in performing and running his own business.
So I think, I think that evidence supports that he does, in fact, have vocational aptitudes for reduced capacity employment.
(Tr. 44-47.)
 {¶ 36} 16. In May 2002, the SHO issued a decision granting PTD. After describing the medical opinion of Dr. Koppenhoefer in detail, the hearing officer adopted his conclusions as to functional capacity:
The Staff Hearing Officer finds that the Claimant is unable to return to his former position of employment as a result of the allowed orthopedic conditions in the claim. The Staff Hearing Officer further finds that the Claimant is capable of per-forming sedentary employment with the limitations and capabilities as set forth in the medical report of Dr. Koppenhoefer.
 {¶ 37} The SHO also described the opinions of Mr. Cody:
An employability assessment of the Claimant was performed by Mr. Cody at the Claimant's request. Mr. Cody noted that Claimant's age of 64 and stated that he is categorized as a person closely approaching advanced age. Mr. Cody opined that this age presents obstacles in terms of adjusting to a new kind of work activity. Mr. Cody further opined that the Claimant's age in conjunction with other non-medical disabilities including a manual trade work history and a limited education, and the physical limitations due to the allowed conditions, renders the Claimant unable to make vocational adjustments to other work. Mr. Cody noted that the Claimant has an eleventh grade education without completing a GED and without participating in any vocational training. He characterized that education as a limited education. Mr. Cody further reviewed the Claimant's work history and noted that he was employed for a period of 24 years as a truck driver. Mr. Cody opined that the skills acquired through the performance of this position transfer to light duty driving occupations, which exceed the Claimant's physical restrictions. He further reviewed the Claimant's more remote occupations, such as assembler, farm worker, service station worker, and aluminum installation worker and opined that the Claimant did not acquire transferable skills to the labor market of today because the process in performing the required tasks has changed over the past 27 years. He further opined that the tool usage skills that do transfer to tasks performed today exist only in jobs performed at a medium or higher level of physical demand Considering the Claimant's age, education, and work experience in conjunction with the physical limitations due to the allowed conditions, Mr. Cody opined that the Claimant is unemployable.
Next, the SHO set forth an analysis of the vocational and medical factors:
The Staff Hearing Officer finds that the Claimant is 64 years old, has an eleventh grade education, and work experience as a truck driver, material handler, remodeling salesman, subcontractor, installer, installation manager, dairy farm worker, service station attendant, and usher. The Staff Hearing Officer further finds that the Claimant returned to work following this industrial injury in the AWP program at the terminal performing a transitional work program provided by the Employer. As part of that employment, the Claimant picked up bills behind trailers and transported them to a billing office. On seldom occasions, the Claimant answered the telephone. The AWP program terminated with an unsuccessful return to work at his regular job. The Employer submitted video tape evidence which it sought to introduce at the hearing, over the Claimant's objection. The Staff Hearing Officer has reviewed the rules governing the submission of videotaped evidence and finds that Claimant [sic] complied with the provision that the evidence be submitted with 14 days notice in advance of the hearing. The Staff Hearing Officer has viewed the videotaped evidence which filmed the Claimant's activities including ambulating around his home, carrying a storm door and using tools to install the storm door. The Staff Hearing Officer finds that the video-taped evidence does not demonstrate the Claimant's ability to perform such employment on a sustained gainful basis. The Staff Hearing Officer further finds that the Claimant's activities do not demonstrate that he is capable of performing gainful employment in excess of the physical limitations found by Dr. Koppenhoefer. The Staff Hearing Officer finds that the Claimant's age is a barrier in that it would negatively impact on his ability to adapt to new work rules, processes, methods, procedures and tools involved in a new occupation. The Staff Hearing Officer further finds that the Claimant's education is a barrier in that it would limit the Claimant's ability to access a full range of sedentary occupations. The Staff Hearing Officer finds that the Claimant is capable of reading, writing, and performing basic mathematics, but has no specific vocational training for other occupations. The Staff Hearing Officer further finds that the Claimant's work experience does not provide him with transferable work skills to sedentary occupations. Con-sidering the Claimant's age, education, and work experience, which are all negative reemployment factors, in conjunction with the limitations associated with the allowed orthopedic conditions in the claim, the Staff Hearing Officer finds that the Claimant is unable to perform any form of gainful employment. Accordingly, the Claimant's application for Permanent Total Disability Compensation is granted.
* * *
This order is based on the medical report of Dr. Koppenhoefer and the vocation report of Mr. Cody.
 {¶ 38} 17. The employer filed an application for reconsideration, but the commission members voted unanimously to deny it.
Conclusions of Law
 {¶ 39} In this action, the employer contends that the commission committed two abuses of discretion in awarding PTD compensation: (1) it relied on a vocational report that could not constitute "some evidence" on which the commission could rely; and (2) it "completely ignored" claimant's testimony at the hearing about his vocational capabilities.
 {¶ 40} The employer argues that Mr. Cody's report must be excluded from evidence as a matter of law because he "did not review the complete PTD application." The employer argues that the vocational questionnaire is a supplemental part of the PTD application and that Mr. Cody failed to review it. In his report, however, Mr. Cody expressly stated that he reviewed the PTD application, including the educational and vocational histories. It is not possible to tell whether Mr. Cody's reference to the vocational history included the questionnaire, which — as the employer acknowledges — is a supplement to the application.
 {¶ 41} The employer infers, however, that Mr. Cody could not possibly have reviewed the questionnaire because he reached the opinion that claimant had "no experience or skills that transfer to positions performed at the sedentary level of physical demand" The magistrate disagrees, finding that the opinion was within the range of opinions that a vocational expert could render without being outside the bounds of admissible expert testimony. For example, one vocational evaluator may view the concept of transferable vocational "skills" broadly as including the general capacity to follow instructions, the general ability to get along with people, and basic literacy. Another vocational expert might take a narrower view of transferable skills as involving a manual skill, such as the physical skill possessed by a carpenter or wallpaper hanger. Similarly, although one vocational expert might include items of knowledge as included within the concept of a transferable skill, another expert might not.
 {¶ 42} In Mr. Cody's report, it was reasonably clear how he
was using the term "transferable skill." He indicated that he was assessing the claimant's manual skills in using tools and operating equipment. For example, he found that the driving skills would transfer to jobs in the light category, but he discounted the manual skills gained in the construction jobs because they were remote in time and the tools/equipment were no longer current, which was a matter of opinion. Moreover, the commission had before it the evidence of claimant's literacy and knowledge of construction matters (such as home-remodeling estimates and work orders), and it could determine how much weight to give to these factors. Claimant provided details with respect to his literacy and knowledge, not only in the vocational questionnaire but also in cross-examination where he reiterated that he had demonstrated the ability to read and follow instructions, read maps, fill out forms, work with people, etc. Further, the employer provided strong arguments to the commission regarding the work history and how claimant had demonstrated abilities and aptitudes that could be used to learn and perform sedentary work. The employer argued in detail as to why the commission should discount the Cody report as unpersuasive. Thus, the hearing officer was well aware of the details of claimant's work history and how it could be interpreted as supporting a capacity to return to work. The commission simply found Mr. Cody's report more convincing than the report of Ms. Carr or Mr. Macy. The magistrate concludes that Mr. Cody's statement about claimant's lack of transferable skills for sedentary work was not a fatal defect that must disqualify his report from evidentiary consideration.
 {¶ 43} The employer also faults Mr. Cody for stating only that claimant performed "light duty" in the alternative work program and for failing to recognize that claimant performed clerical duties of a sedentary nature while participating in the program. However, the employer's affidavit was not filed until January 2002, months after the Cody report was submitted. Moreover, the record includes divergent testimony regarding the extent of the clerical duties that claimant performed while participating in the AWP. The commission's independent analysis of the vocational factors shows that it adopted claimant's testimony as accurate and rejected the employer's description.
 {¶ 44} Further, the employer argues that the Cody report "must be viewed with skepticism" because he omitted any reference to claimant's self-employment and his work as a manager. However, claimant had worked for the last 24 years as a truck driver, and there is no conclusive requirement that a vocational evaluator must discuss the significance of all remote employment. For example, while it is true that claimant also worked for years on a dairy farm, during which time he probably learned a lot about dairy cows and the dairy business, Mr. Cody's report is not barred from consideration because he did not discuss the transferability of the knowledge and skills developed as a dairy farmer. Mr. Cody's sketchy coverage of the more remote employment affected the persuasiveness of his opinions, not their admissibility.
 {¶ 45} Further, the magistrate acknowledges that Mr. Cody stated that claimant did not have vocational training, whereas the record reveals that he had some on-the-job training in trucking matters during his years as a driver, and also had some on-the-job training in product lines when doing installation estimates. Again, this is a factor that is subject to interpretation. On-the-job training could be viewed as extremely significant, or it could be viewed as relating to jobs the claimant can no longer physically perform. Mr. Cody's statement that claimant had 11 years of formal education and no vocational training did not render his report invalid as a matter of law. His comment regarding "vocational training" could have been limited to formal vocational rehabilitation or formal training at a vocational school.
 {¶ 46} In sum, the magistrate accepts that the Cody report had imperfections that could have made it unpersuasive. See, generally, State ex rel. Blanton v. Indus. Comm.,99 Ohio St.3d 238, 2003-Ohio-3271
(distinguishing between a flaw that gives the commission grounds to reject an expert's report and a flaw that disqualifies the expert report from consideration). The magistrate acknowledges that Mr. Cody appeared to minimize or skim over experiences suggesting that claimant could return to some type of work and, in contrast, emphasized the factors suggesting that claimant could not perform sustained remunerative employment. However, the magistrate concludes that the imperfections in Mr. Cody's report went to its weight and credibility rather than disqualifying the report from evidentiary consideration as a matter of law.
 {¶ 47} Second, the employer argues that the commission abused its discretion in refusing to accept claimant's own testimony regarding his vocational abilities and aptitudes and in failing to recognize that claimant had actually demonstrated his ability to perform sedentary work in the AWP. For example, during the hearing, claimant stated that he could read a newspaper, write a check, make change for a $20 bill, read a contract, and fill out forms. He said he could read a trucking manifest and a roadmap, and had a working knowledge of trucking regulations. Claimant agreed that he could perform a remodeling estimate or inspection if everything were the same as 25 years ago but said he would be unable to do installation, inspections or supervision on a sustained basis. As for the AWP, claimant said that the employer paid him for doing nothing. He stated that he would just walk the dock and pick up bills and take them to the billing clerk. Contrary to the manager's affidavit, claimant testified that he was not able to use a computer successfully during the light-duty program, and he testified that he rarely answered a telephone. Claimant further stated that he was unable to perform the AWP work on a sustained basis during the two periods that he participated, due to his medical limitations. As noted above, the commission's findings regarding the AWP demonstrate that it accepted claimant's testimony and rejected the employer's testimony. In addition, although the claimant expressed confidence that, with training, he could pick up the ability to use a computer, the line of questioning had dealt in part with whether he could use the internet at home. Claimant never expressed a belief that he could perform sustained remunerative employment by developing computer skills.
 {¶ 48} In other words, while the employer has highlighted a number of factors that could easily have supported a denial of PTD, the evidence as a whole was susceptible to interpretation. The commission — as the finder of fact — had discretion to be persuaded or not as to whether the claimant was unable to perform sustained remunerative employment. State ex rel. Moss v. Indus.Comm. (1996), 75 Ohio St.3d 414 (stating that the commission is the exclusive evaluator of disability and that the court will not substitute its judgment for that of the commission). The magistrate recognizes that, in other PTD cases where the claimant lacked transferable skills, the commission found the claimant able to perform sustained remunerative employment based on modest literacy and generally useful traits. See, e.g., id. (denying PTD to a 78-year-old applicant with an 8th grade education and ability to read, write and do basic math, who had worked as a housekeeper); State ex rel. West v. Indus. Comm. (1996),74 Ohio St.3d 354 (ruling that the commission may rely on a claimant's ability to read, write and perform basic math — even if not well — in concluding that claimant is capable of performing an entry-level position); State ex rel. Ewart v.Indus. Comm. (1996), 76 Ohio St.3d 139.
 {¶ 49} The commission has broad discretion to view a work history or age as negative or positive. E.g., Ewart; Moss,
supra. For example, in Ewart, the Ohio Supreme Court observed that performing only one job for many years could be viewed as an asset (showing steadiness and dependability) or as a disadvantage (showing narrowness of experience and skills). The court made clear that the commission had discretion as the finder of fact to view an unskilled work history as positive or negative. Id. The court did not state that the commission must reach the same interpretation of work history in each case. For example the commission may view a skilled work history as useless if the claimant cannot physically perform the skilled work. See, generally, State ex rel. Mann v. Indus. Comm. (1998),80 Ohio St.3d 656, 659; State ex rel. McComas v. Indus. Comm. (1997),77 Ohio St.3d 362. In mandamus, an order supported by "some evidence" must be upheld, regardless of whether the record includes other evidence, greater in quantity and/or quality,
that supports the contrary decision. State ex rel. Pass v.C.S.T. Extraction Co. (1996), 74 Ohio St.3d 373, 376.
 {¶ 50} The court's role in mandamus is limited. Even where the court believes that the evidence on which the commission relied was "not particularly convincing," it cannot impose its own evaluation of the facts. See State ex rel. Mobley v. Indus.Comm. (1997), 78 Ohio St.3d 579, 584. In State ex rel. King v.Trimble (1996), 77 Ohio St.3d 58, 63, the court stated that, although the evidence was "not particularly compelling to us," the court would not substitute its judgment for the commission's. Here, although the magistrate agrees that the evidence suggesting a capacity for some type of work seems more compelling on paper than the evidence suggesting PTD, the court cannot substitute its judgment for the judgment of the commission. The commission heard claimant's testimony, the court did not. In sum, the magistrate concludes that the commission was within its discretion to determine that the medical and nonmedical factors in combination prevented claimant from performing sustained remunerative employment.
 {¶ 51} The magistrate concludes that the employer has not met its burden of proof in mandamus and accordingly recommends that the court deny the requested writ.